IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**SHERRY BURNETTE,**

      **Plaintiff,**

vs.                                                     No. CIV 00-1297 JP/LCS

**LARRY G. MASSANARI,**
**ACTING COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse and Remand (Doc. 8), filed July 27, 2001. The Commissioner of Social Security issued a final decision denying Plaintiff's application for disability insurance benefits and supplemental security income. The United States Magistrate Judge, having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, finds that the motion is not well-taken and recommends that it be **DENIED**.

### PROPOSED FINDINGS

    1.    Plaintiff, now forty-eight years old, filed her applications for disability insurance benefits and supplemental security income on February 21, 1997, alleging disability commencing February 16, 1996, due to arthritis in her hands and lower back. (R. at 41-43; 52; 195-197.) She is a hich school graduate with vocational training. (R. at 122-123.) Her past relevant work was as a secretary, waitress, convenience store clerk, and post office clerk. (R. at 226-231.)

    2.    Plaintiff's applications for disability insurance benefits and supplemental security

income were denied at the initial level on June 3, 1997, (R. at 22-23;198), and at the reconsideration level on August 28, 1997. (R. at 24-25; 203.) Plaintiff appealed the denial of her applications by filing a Request for Hearing by Administrative Law Judge (ALJ) on October 30, 1997. (R. at 20-21.) The ALJ held a hearing on April 13, 1998, at which Plaintiff appeared and was represented by counsel. (R. at 214.) Plaintiff and Pamela Bowen, a vocational expert (VE), testified.

   3. The ALJ issued his decision on May 18, 1998. (R. at 13-18.) The ALJ determined that Plaintiff had disability insured status through March 31, 1997. (R. at 13.) The ALJ analyzed Plaintiff's claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan,* 987 F. 2d 1482, 1487 (10th Cir. 1993). At the first step of the sequential evaluation process, the ALJ found that Plaintiff had engaged in some post-onset date substantial gainful activity, but proceeded to the subsequent steps of the analysis. (R. at 13.) At the second step, the ALJ determined that Plaintiff had a severe impairment of arthritis. (R. at 14.) At the third step of the sequential analysis, the ALJ found that the severity of Plaintiff's impairment had not met or equaled any of the impairments found in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599. (R. at 14-16.) The ALJ then found that Plaintiff had the residual functional capacity for at least light work, allowing her to change posture at least once an hour and requiring only occasional stooping and couching and only limited fingering and handling. (R. at 16-17.) The ALJ determined that Plaintiff's past relevant work as a waitress and an auto self service sales person did not entail an exertional capacity for more than light work and that Plaintiff was able to perform her past relevant work. (R. at 17.) Thus, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

   4. Plaintiff filed a request for review of the ALJ's decision, (R. at 9), and submitted

additional evidence to the Appeals Council. (R. at 181-183.) On July 12, 2000, the Appeals Council, after considering the additional evidence, denied the request for review. (R. at 5.) Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. On September 13, 2000, Plaintiff filed this action, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).

**Standard of Review**

5.	The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *See Hamilton v. Secretary of Health and Human Services,* 961 F. 2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Secretary of Health and Human Svcs.*, 985 F. 2d 1045, 1047 (10th Cir. 1993) (quoting *Broadbent v. Harris*, 698 F. 2d 407, 414 (10th Cir. 1983) (citation omitted)). A decision of an ALJ is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record. *See Gossett v. Bowen*, 862 F. 2d 802, 805 (10th Cir. 1988).

6.	In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *See Thompson v. Sullivan*, 987 F. 2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)(1)(A)).

7.	At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets

3

or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *See id.*

**Administrative Record**

       8.       On April 10, 1990, Dr. John Erickson, M.D., examined Plaintiff. (R. at 123.) Plaintiff reported that she had suffered from pain in her left hip for years and that she had prior vertebral fractures. (*Id.*) The pain prevented her from lying down on the left hip and caused her trouble with sitting and standing when she worked as a waitress at Denny's. (*Id.*) Plaintiff had been taking Indocin for eight years. (*Id.*) Plaintiff reported a "catching" in her hip, but there was no real history of her leg giving way. (*Id.*) The pain was worse with changes in cold weather and sometimes would awaken her at night. (*Id.*) Plaintiff did not notice any increase in pain with squatting or running. (R. at 123.) Dr. Erickson observed that the hip had a completely normal range of motion, but X-rays revealed degenerative changes in the region of the greater trochanter. (*Id.*) There was a marked snapping sound with flexion of the hip. (*Id.*) Dr. Erickson felt that a tendon was snapping over the trochanter. (*Id.*) He took Plaintiff off the Indocin, and prescribed Ansaid and hot packs. (*Id.*)

       9.       On April 19, 1990, Plaintiff called Dr. Erickson to state that the Ansaid was not working. (R. at 123.) Dr. Erickson prescribed Nalfon. (*Id.*) On April 25, 1990, Plaintiff complained that the Nalfon was not working. (*Id.*) Dr. Erickson injected Depo Medrol and Xylocaine and prescribed Percocet. (R. at 122-123.) On June 7, 1990, Plaintiff complained that the cortisone shots did not help and asked to try additional medication. (R. at 122.) Dr. Erickson prescribed Percocet

4

and Naprosyn. (*Id.*)

10. Plaintiff next saw Dr. Erickson on April 14, 1992, due to a recurrence in her trochanteric bursitis. (R. at 122.) Dr. Erickson prescribed Naprosyn and Percocet. (*Id.*) On April 30, 1992, Plaintiff was feeling much better. (*Id.*) Plaintiff stated that she preferred Ansaid, so Dr. Erickson prescribed it in place of Naprosyn. (*Id.*) On May 13, 1992, Plaintiff complained of neck pain and Dr. Erickson prescribed Percocet and Lodine. (*Id.*)

11. On November 18, 1992, Plaintiff again complained of trochanteric bursitis. (R. at 121.) Dr. Erickson injected Depo Medrol and Lidocaine and prescribed Lodine, Percocet and ice packs. (*Id.*) Plaintiff had been overdosing on her father's Indocin. (*Id.*) On December 1, 1992, Dr. Erickson noted that Plaintiff had gone bowling and aggravated her arm condition. (*Id.*) Before she went bowling, Plaintiff had been doing better. (*Id.*) Dr. Erickson prescribed Vicodin and Ansaid. (*Id.*) On December 17, 1992, Plaintiff came in to refill her medication. (*Id.*) She was quite depressed because her father had died the day before. (*Id.*) On January 21, 1993, Plaintiff stated that the weather worsened her condition. (*Id.*) Dr. Erickson prescribed Naprosyn and Vicodin. (*Id.*)

12. On March 18, 1993, Dr. Erickson noted that Plaintiff had fallen at Albertson's three to four weeks before, aggravating her pain. (R. at 120.) Dr. Erickson gave her Ansaid and Percocet. (*Id.*) In April 1993, Dr. Erickson prescribed Locet and Halicone, but later discontinued these two medications because they were not working. (*Id.*) Dr. Erickson referred Plaintiff to Dr. Van Pelt for her neck pain. (*Id.*)

13. On June 7, 1994, Plaintiff presented to Dr. Frank Maldonado for pain in her left hip and leg. (R. at 143.) Plaintiff reported that she had been involved in four traffic accidents at age sixteen, one of which fractured vertebrae in her lumbar and cervical region, that she may have injured

5

her hip during childbirth, or during two more automobile accidents that occurred in the 1980s. (*Id.*) Plaintiff stated that her pain had been increasing over the prior six months and that the pain was aggravated by sitting, standing, lying down, walking, bending, and lifting. (*Id.*) Plaintiff estimated that she could walk up to two and a half miles before she start to limp. (*Id.*) She had no weakness or numbness in her feet, or giving way of her legs. (*Id.*)

   14. Dr. Maldonado observed a mild increase in lumbar lordosis, tenderness to percussion over the lower lumbar spine with no spasm, and noted that Plaintiff was in minimally acute distress. (R. at 144.) Plaintiff was able to stand on her toes and heels. (*Id.*) Forward bending was to her ankles, extension and lateral bending were done well. (*Id.*) Leg lengths and reflexes were normal, but when lying on her right side, she was unable to abduct her left hip. (R. at 145.) Dr. Maldonado reviewed Plaintiff's x-rays and observed osteoarthritic spurring on the anterior aspect of intervertebral bodies in the lumbar region and mild sclerosis of the lubrosacral facets. (*Id.*) The left hip joint was benign, but there was a flocculent density just lateral to the cortex, staring at the greater trochanter. (*Id.*) Dr. Maldonado diagnosed painful left hip (probably soft tissue), no primary hip joint pathology and mild arthritis of the lumbar spine. (*Id.*) Dr. Maldonado suggested that Plaintiff undergo a CT scan. (*Id.*)

   15. On June 27, 1994, Dr. Maldonado observed that Plaintiff's CT scan was normal with no disturbances in the soft tissue. (R. at 146.) Dr. Maldonado noted that the radiologist also did not see a distortion. (*Id.*) Dr. Maldonado diagnosed soft tissue inflammation with radiographic changes and told Plaintiff that she could live with it or have it excised. (*Id.*). Dr. Maldonado also suggested that Plaintiff undergo an MRI. (*Id.*)

   16. On August 11, 1994, Plaintiff reported to Dr. Maldonado that she had been to a

"cancer doctor" in Lubbock, who agreed that she did not have cancer. (R. at 147.) Dr. Maldonado recommended an MRI and exploratory surgery. (*Id.*) On September 7, 1994, Dr. Maldonado noted that the MRI revealed a projection of bone coming off the greater trochanter going posteriorly and recommended exploratory surgery. (R. at 148.) Plaintiff ultimately decided against having the surgery. (*Id.*)

17. On September 26, 1994, Dr. Paul Theo evaluated Plaintiff. (R. at 118.) Plaintiff complained of pain in the region of the left greater trochanter that she had suffered on and off for many years. (*Id.*) Plaintiff attributed the pain to a motor vehicle accident occurring at age sixteen that fractured vertebrae in her low back and neck. (*Id.*) Plaintiff also stated that the pain became worse after her child was born, twenty-one years before the examination. (*Id.*)

18. On examination, Plaintiff's ability to flex and rotate her back was within normal limits. (*Id.*) Reflexes and sensory appreciation was normal and there was no motor weakness. (R. at 118.) Plaintiff had pain on extreme left leg raising, but her range of hip motion was unrestricted. (*Id.*) Dr. Theo's review of an MRI and CT scan revealed no abnormalities, but the radiologist's report was not available. (*Id.*) X-rays of the lumbar spine showed degenerative change at L1-2 with retrolisthesis of L3 on 4, and mild facet degenerative change. (*Id.*) Plaintiff's cervical spine showed flattening of normal cervical lordosis and some degenerative change in the mid-cervical vertebrae. (*Id.*) Dr. Theo injected Plaintiff's left trochanteric bursa with Kenalog, Marcaine and local anesthetic and suggested she return in about six to eight weeks for reassessment. (*Id.*)

19. On April 12, 1995, Plaintiff presented to Dr. A.H. Gutierrez for treatment of asthmatic bronchitis and stuffy head. (R. at 136.) On November 27, 1995, Plaintiff saw Dr. Gutierrez for boils all over her body and to obtain a chest x-ray. (*Id.*) Dr. Gutierrez noted that Plaintiff had smoked one

and a half packs of cigarettes a day for 30 years. (*Id*.)  The chest x-ray revealed no acute pulmonary pathology, congestion, or edema.  (R. at 137.)

20. On February 8, 1995, Plaintiff was evaluated at the Texas Back Institute.  (R. at 142.) Plaintiff reported a twenty-year history of lateral left hip and thigh pain, which had gradually worsened. (*Id*.)  Plaintiff reported that the pain in her left hip and lateral thigh increased in August 1994, that the pain was constant but increased with activity, but denied parethesia. (*Id*.)  Dr. John Regan, M.D. diagnosed left trochanteric bursitis and recommended referral to Dr. Head's clinic. (*Id*.)

21. On January 11, 1996, Plaintiff complained to Dr. Gutierrez of chest congestion and stress. (R. at 126.) On August 6, 1996, Dr. Gutierrez saw Plaintiff for possible allergies, sore throat, headaches, and head and chest congestion. (*Id*.)  On August 13, 1996, Plaintiff complained to Dr. Gutierrez of  pain in her ankle. (R. at 124.)  In September 1996, Dr. Gutierrez treated Plaintiff for asthma, cough, and congestion.  (*Id*.)

22. Plaintiff returned to Dr. Erickson on October 28, 1996, complaining of pain in both hands.  (R. at 120.)  X-rays revealed some arthritic spurring in the carpel bones. (*Id*.) Dr. Erickson prescribed Relafen. (*Id*.)  On December 9, 1996, Plaintiff complained of arthritis.  (R. at 117.)  Dr. Erickson prescribed Peroxican, Soma and Lorcet.  (*Id*.)  On January 27, 1997, Plaintiff asked Dr. Erickson about Social Security disability, but he recommended that she go to the Department of Vocational Rehabilitation, and stated that he did not feel she could resume her job as a waitress.  (*Id*.)

23. On February 12, 1997, Plaintiff told Dr. Erickson that she would only be able to come back one more month because her insurance was running out.  (R. at 117.)  Dr. Erickson continued to refill Plaintiff's prescriptions in March, April and May of 1997.  (R. at 116-117.)

24. On May 12, 1997, Dr. Alan Jakins, M.D. performed a consultative examination.  (R.

at 149.) Plaintiff complained of arthritic hands, and low back, hip and neck pain. (*Id*.) Plaintiff reported that her hands had started hurting in 1994, and that her back pain had worsened in 1995. (*Id*.) Plaintiff traced her neck, back and hip pain to seven motor vehicle accidents. (*Id*.) On examination, Dr. Jakins found no instability of any joints, and no muscle spasm. (*Id*.) She had a normal range of motion in her shoulders and hips, but a slightly deficient grip strength. (R. at 150.) The cervical spine showed a normal range of motion. (*Id*.) The lumbar spine examination showed flexion to 60 degrees, lateral flexion to ten degrees on the left and fifty degrees on the right, all with discomfort. (*Id*.) Rotation was full and Plaintiff was able to squat, walk on her toes and heels. (*Id*.) Reflexes were symmetrical. (*Id*.) Plaintiff exhibited good muscle tolerance in the arms, without spasm, tremor, or posturing. (*Id*.) Tone was non-exceptional. (*Id*.)

25.   Dr. Jakins observed clinical evidence of osteoarthritis and that Plaintiff appeared to be in a state of relative malnutrition. (R. at 151.) Dr. Jakins opined that Plaintiff was able to lift up to 30 pounds occasionally and 20 pounds frequently, to stand without interruption for two hours, to stand with interruption for four hours during an eight-hour workday, to sit without interruption for one hour, and to sit with interruption for four hours during an eight hour workday. (R. at 151; 154-155.) Dr. Jakins observed that Plaintiff's abilities to reach, feel, speak, and hear were not significantly impaired, but that her ability to travel was limited by her low back pain. (R. at 151; 155.)

26.   On June 3, 1997, Dr. Nancy Nickerson, M.D. , a physician employed by the agency completed a residual functional capacity assessment questionnaire. (R. at156-164). Dr. Nickerson found that Plaintiff was able to lift up to 50 pounds occasionally and 25 pounds frequently, sit for six hours out of an eight-hour workday and stand or walk for six hours out of an eight-hour workday, (R. at 158), and could frequently climb, balance, stoop, kneel, crouch and crawl. (R. at 159.) On

9

August 28, 1997, Dr. Clinton W. Morgan, M.D., another agency physician, concurred with Dr. Nickerson's assessment. (R. at 164.)

27.     On July 3, 1997, Dr. Erickson noted that Plaintiff had been moving "a lot of furniture" and had aggravated her condition. (R. at 116.) Dr. Erickson refilled Plaintiff's medications in September 1997, but on October 9, 1997, the Ansaid was substituted for Feldene because Plaintiff reported that her boyfriend took some of her medication. (R. at 166.) Dr. Erickson refilled Plaintiff's Naprosyn, Vicodin, Soma, and Lorcet in November and December 1997, and in January and February 1998. (R. at 166-167.) On March 5, 1998, Plaintiff reported that she was going to start a job. (R. at 167.) Dr. Erickson gave her Percocet, Soma and Naprosyn. (*Id.*)

28.     Plaintiff testified at the April 13, 1998 hearing that she had worked as a clerk for three and a half months, and in a flower shop for about two months within the preceding two years. (R. at 219.) Plaintiff lived with her daughter-in-law in Plaintiff's house. (*Id.*) At times, Plaintiff mopped and vacuumed the house. (*Id.*) Plaintiff was unable to do yardwork, had given up bowling and "most of everything." (R. at 220.) Plaintiff read and watched television. (*Id.*) She was able to walk about two blocks before her hips and back stared hurting her. (R. at 221.)

29.     Plaintiff had a drivers' license and had traveled to Oklahoma at Christmas to see her granddaughter. (R. at 221.) Plaintiff had gone to Clovis the day before the hearing with her boyfriend to visit his aunt. (R. at 222.) Plaintiff spent her days watching television with her boyfriend. (*Id.*) Sometimes they walked to the beach or went for a Coke. (*Id.*)

30.     Plaintiff had graduated from high school and had attended trucking and beauty school. (R. at 223.) Plaintiff was unable to finish trucking school because of her pain. (*Id.*) He last job was at the Federal Law Enforcement Training Center, where she had worked as a clerk from November

1997 to February 1998, for forty hours a week at $3.50 per hour. (*Id*.) Plaintiff testified that her big toe hurt when she drove to work and her back hurt her at work. (R. at 224.) When Plaintiff would get up to go to work, her back, elbows, and hands hurt, so she felt the pay was not worth it. (*Id*.)

31.     At her job at the Federal Law Enforcement Training Center, Plaintiff worked on the computer and filed. (R. at 224-225.) She spent up to six hours a day sitting down, and two hours standing up. (R. at 225.) If it was not very busy, she would go outside and walk around. (*Id*.) In July 1996, Plaintiff worked in a flower shop for about two months for four hours a day. (R. at 226.) Before that Plaintiff worked as a secretary for her ex-husband's company for five to eight hours a day for eight years. (R. at 226-227.) Before she worked for her husband, Plaintiff was a waitress at Denny's from 1987 to 1989. (R. at 228.) Plaintiff also worked as a sales clerk at convenience stores and as a postal clerk at a subcontracting post office. (R. at 229-230.)

32.     Plaintiff had been in pain since age 23, but it became worse as she got older. (R. at 233-234.) Plaintiff testified that her back, hips, neck and hands would sometimes "get real crazy on [her]." (R. at 234.) Plaintiff had problems opening file drawers and stooping to file documents at her clerk job. (R. at 236.) Some days her hand "would go crazy," and she had difficulty typing and writing. (R. at 237.) Plaintiff testified that she would have difficulty working as a clerk, beautician, waitress, secretary or post office clerk, (R. at 237-239), and her medication did not help. (R. at 240.)

33.     In response to the ALJ's first hypothetical question, Pamela Bowen, the VE testified that an individual such as Plaintiff would be able to work as a waitress, station attendant, surveillance system monitor, customer service clerk, or parking lot attendant. (R. at 244-245.) In response to the ALJ's second hypothetical question, the VE testified that Plaintiff would be able to work in 50%

11

of waitress jobs, all self service station attendant jobs and all customer service clerk jobs. (R. at 246.) In response to the ALJ's third hypothetical question, the VE testified that Plaintiff would be able to do the same jobs as those given in the response to the first hypothetical. (R. at 246.) In response to the ALJ's fourth hypothetical question, the VE testified that Plaintiff would be able to do the same jobs as those in the response to the second hypothetical. (R. at 246.)

34.     After the ALJ issued his decision, Plaintiff submitted additional evidence that was included in the record and considered by the Appeals Council. This additional evidence consisted of records concerning Plaintiff's mental health treatment. On March 31, 1998, Plaintiff presented to Sarita Rao, M.A., LPCC with feelings of helplessness, hopelessness and depressed mood for the prior two years. (R. at 207.) Plaintiff reported feeling overwhelmed, frustrated, having irritable moods and suffering from chronic fatigue that interfered with her ability to meet family and social needs. (*Id*.) Plaintiff's eating and sleeping habits were disturbed. (*Id*.) Ms. Rao diagnosed major depression, recurrent, assessed Plaintiff's GAF score [1] at 52 to 55, and recommended individual psychotherapy. (R. at 208.)

35.     On April 28, 1998, Plaintiff told her therapist that she had been trying to find a job for two years. (R. at 209.) Plaintiff stated that if she had a job, "it would solve all [her] problems." (*Id*.) On that day, Plaintiff's GAF was assessed at 50 and she was prescribed Paxil. (R. at 212.) On May 12, 1998, Plaintiff complained that the Paxil made her shake and feel terrible, so Diazepam was

---

[1] A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning." *See* American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed. 1994) at 30. The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id*. at 32.

prescribed instead. (R. at 213.)

**Discussion**

36. Plaintiff contends that the Appeals Council improperly evaluated the new psychiatric evidence by failing to utilize a psychiatric consultative examination or medical advisor and improperly evaluated Plaintiff's credibility. In addition the these main issues, Plaintiff tangentially asserts additional issues in her briefs.

37. In this case, Plaintiff contends that the Appeals Council was required to utilize a medical advisor to assess the severity of her mental condition and should have included findings regarding the mental impairment in a hypothetical question to a vocational expert. Plaintiff is asking this Court to review the Appeals Council's denial of her request for review, a non-reviewable agency action.

38. Judicial review of a decision of the Secretary is limited by 42 U.S.C. § 405(g) to "a final decision of the Secretary made after hearing." *Califano v. Sanders*, 430 U.S. 99, 108 (1977); *Dozier v. Bowen*, 891 F. 2d 769, 771 (10th Cir. 1989). In *Califano* the claimant sought judicial review of the Appeals Council's decision not to reopen his case, and the Supreme Court held that a decision by the Appeals Council not to reopen a case was not a "final decision of the Secretary made after hearing," and was therefore not reviewable by the federal courts, absent a constitutional challenge. *Califano*, 430 U.S. at 108.

39. In *Dozier*, the claimant asserted that he raised a constitutional challenge because the Appeals Council relied on a post-hearing medical advisor that he had not been permitted to cross examine. *Dozier*, 891 F. 2d at 772. The Tenth Circuit found that the claimant had been afforded an opportunity to object to interrogatories propounded to the medical advisor and that claimant did not

13

raise a constitutional issue as contemplated by *Califano*. *Id*. In *Dozier*, the Tenth Circuit applied *Califano* and held that a decision by the agency not to reopen a case was not a final decision of the Secretary made after hearing, and was therefore not reviewable. *Dozier*, 891 F. 2d at 772.

40.     Plaintiff seeks judicial review of the Appeals Council's denial of her request for review because she believes the Appeals Council should have obtained additional evidence. Plaintiff's argument cannot be read to raise a constitutional challenge to the denial of review. *See Dozier*, 891 F. 2d at 772. In the absence of a constitutional challenge, denial of a request for review by the Appeals Council is not subject to judicial review. *Califano*, 430 U.S. at 108; *Dozier*, 891 F. 2d at 772; 42 U.S.C. § 405(g). Thus, Plaintiff's argument that the Appeals Council was required to further develop the record is not subject to review herein.

41.     Plaintiff submitted evidence of her mental condition to the Appeals Council after the ALJ denied her claim. Pursuant to 20 C.F.R. § 404.970(b), the Appeals Council is required to consider evidence submitted with a request for review if the additional evidence is new, material, and relates to the period under review. *See O'Dell v. Shalala*, 44 F. 3d 855, 858 (10th Cir. 1994) Evidence is new within the meaning of § 404.970(b) "if it is not duplicative or cumulative," and it is material "if there is a reasonable possibility that [it] would have changed the outcome." *Wilkins v. Secretary, Dep't of Health & Human Servs.*, 953 F. 2d 93, 96 (4th Cir.1991). To be chronologically pertinent, "the proffered evidence [must] relate to the time period for which the benefits were denied." *Hargis v. Sullivan*, 945 F. 2d 1482, 1493 (10th Cir.1991).

42.     The Appeals Council considered the evidence of Plaintiff's mental health treatment and found that it provided no basis for changing the ALJ's decision because Plaintiff did not seek mental health treatment until March 31, 1998 and that any limitations resulting from a mental

impairment would not preclude her from engaging in light work activity. (R. at 5.) Thus, in determining whether substantial evidence supports the Commissioner's decision, a court must examine the record as a whole, including the additional materials submitted to the Appeals Council. *See O'Dell v. Shalala*, 44 F. 3d 855 at 858.

43. The new evidence does not require a change in the ALJ's determination because the decision "remains supported by substantial evidence." *See O'Dell*, 44 F. 3d at 859. The new evidence indicated that Plaintiff was suffering from mild depression and needed psychotherapy. (R. at 208-209; 212.) The fact that a claimant suffers from depression does not automatically establish that the claimant is disabled. *Bernal v. Bowen*, 851 F. 2d 297, 301 (10th Cir. 1988). Plaintiff told her therapist that she was looking for a job and that all her problems would be solved if she could find a job. (R. at 209.) Plaintiff's therapists did not express an opinion that Plaintiff was unable to work due to her mental condition. The new evidence does not contradict the ALJ's conclusions. Based on a review of the administrative record, I conclude that substantial evidence supports the Commissioner's determination that claimant is not disabled within the meaning of the Social Security Act.

44. Moreover, to the extent that the new evidence indicates the Plaintiff's condition is deteriorating, it is outside the relevant time period. Proffered new evidence must be related to the time period for which the benefits were denied. *See Hargis v. Sullivan*, 945 F. 2d at 1493 (*citing Johnson v. Heckler*, 767 F. 2d 180, 183 (5th Cir. 1985)). In this case, the new evidence is outside the relevant time period because it was compiled at the very end of the time period considered by the ALJ, *i.e.*, the time period ending May 18, 1998, the date of the decision. If her condition has deteriorated since the ALJ issued his decision, Plaintiff may wish to file a new application. *See*

*Johnson*, 767 F. 2d at 183.  Relief is not warranted on this first ground.

   45. Plaintiff implies that the ALJ failed to fully develop the record.  The claimant has the burden to prove disability in a social security case.  *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir.1997).  Nonetheless, because a social security disability hearing is a nonadversarial proceeding, the ALJ bears responsibility for ensuring that "an adequate record is developed during the disability hearing consistent with the issues raised."  *Henrie v. United States Dep't of Health & Human Servs.*, 13 F. 3d 359, 360-61 (10th Cir.1993).  Generally, "[a]n ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing."  *Carter v. Chater*, 73 F. 3d 1019, 1022 (10th Cir.1996). The degree of effort required by the ALJ to develop the record, however, varies from case to case.  *Cf. Battles v. Shalala*, 36 F. 3d 43, 45 (8th Cir.1994) (noting that whether ALJ has adequately developed record must be determined on case by case basis).

   46. Plaintiff stated in her disability report that she had not been treated by a health care professional for a mental illness since her alleged onset date.  (R. at 52.)  At the hearing, neither Plaintiff nor her attorney mentioned that she had been receiving mental health treatment.  (R. at 214-257.)  Plaintiff stated on an agency form that she had received treatment from Sarita Rao and Carlsbad Mental Health, but did not describe the reason for the treatment.  In October 1997 and January 1998, Dr. Gutierrez wrote "anxiety" in his treatment notes, but did not state the context of the notations.  (R. at 185-186.)  An ALJ cannot be expected to develop the record concerning conditions of which he had no notice.  Under these circumstances, the ALJ did not fail to develop the record.

   47. Plaintiff contends that the ALJ failed to give proper weight to the opinions of her

treating physicians. A treating physician may offer an opinion which reflects a judgment about the nature and the severity of a claimant's impairments. *See Castellano v. Secretary*, 26 F. 3d 1027, 1029 (10th Cir. 1994). The ALJ must give controlling weight to this type of opinion if it is well supported by clinical and laboratory diagnostic techniques and it is not inconsistent with other substantial evidence in the record. *See id.* However, a treating physician's opinion is not dispositive on the issue of disability because final responsibility for determining the ultimate issue of disability rests with the Commissioner. *Id.*

48.     On January 27, 1997, Dr. Erickson stated that Plaintiff could not resume her job as a waitress. (R. at 117.) The ALJ disregarded Dr. Erickson's vocational opinion because there was no evidence in the record that Dr. Erickson was a vocational expert. (R. at 17.) Plaintiff further asserts that the ALJ discounted the opinions of Drs. Theo, Maldonado and Jakins that Plaintiff had pain, abnormalities and osteoarthritis. However, Drs. Theo, Maldonado and Jakins did not opine that Plaintiff was disabled. A review of the ALJ's decision reveals that their opinions were not discounted.

49.     In assessing proper weight to accord the opinion of a treating physician the ALJ must evaluate, *inter alia*, the degree to which the physician's opinion is supported by relevant evidence, the consistency between the opinion and the record as a whole, and other factors brought to the ALJ's attention which tend to support or contradict the opinion. *See Goatcher v. Shalala*, 52 F. 3d 288, 290 (10th Cir. 1995). In this case, the ALJ considered the fact that Dr. Erickson was not qualified as a vocational expert. The ALJ properly disregarded Dr. Erickson's opinion that Plaintiff was unable to return to her job as a waitress. Plaintiff's contention that the ALJ failed to give proper weight to the opinions of her treating physicians is without merit.

50. Plaintiff asserts that the ALJ erred in assessing her credibility. "Credibility determinations are peculiarly the province of the finder of fact," and will not be overturned if supported by substantial evidence. *Diaz v. Secretary of Health & Human Servs.*, 898 F. 2d 774, 777 (10th Cir.1990). Plaintiff established that she suffers from a pain-producing impairment. Therefore, the ALJ was required to consider her complaints of pain by evaluating her use of pain medication, her attempts to obtain relief, the frequency of her medical contacts, and the nature of her daily activities, as well as subjective measures of credibility including the consistency or compatibility of non-medical testimony with the objective medical evidence. *See Kepler v. Chater*, 68 F. 3d 387, 391 (10th Cir.1995).

51. The ALJ properly considered the *Kepler* factors in assessing Plaintiff's credibility. He discussed the inconsistency of Plaintiff's statements regarding the degree of her impairment, the fact that she had worked full time a few months prior to the hearing, the fact that she was seeking employment, her ability to perform daily activities and the absence of objective medical evidence corroborating Plaintiff's claim of numbness and disabling pain in her back, hands, hips and other joints. (R. at 16.) Moreover, the ALJ had the opportunity to observe Plaintiff's demeanor and manner of testifying at the hearing. "[T]he determination of credibility is left to the observations made by the Administrative Law Judge as the trier of fact." *Broadbent v. Harris*, 698 F. 2d 407, 413 (10th Cir. 1983).

52. After observing Plaintiff's testimony at the hearing, the ALJ determined that Plaintiff's subjective complaints and functional limitations were not supported by the evidence as a whole to the disabling degree alleged and therefore lacked credibility. A review of the record establishes that the ALJ's findings are accurate and entirely consistent with the record. The ALJ applied correct legal

18

and standards and substantial evidence supports his determination that Plaintiff's complaints of disabling pain lacked credibility.

53. The ALJ's finding that Plaintiff is not disabled is supported by substantial evidence and is in accordance with the law.

## RECOMMENDED DISPOSITION

The ALJ applied the correct legal standards and the decision is supported by substantial evidence. I recommend that Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 8), filed July 27, 2001, be denied, the decision of the ALJ affirmed, and this case dismissed.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations that party may file with the Clerk of the District Court written objections to such proposed findings and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**